IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 NOV -9  AM 8:22

DEPUTY CLERK_____

| | | |
|---|---|---|
| BILL D. RATLIFF, Institutional ID No. 04687757, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 5:17-CV-296-BQ |
| MARSHA McLANE, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Plaintiff Bill D. Ratliff filed this civil rights action under 42 U.S.C. § 1983 on December 19, 2017. The United States District Court transferred this case on April 25, 2018, to the undersigned United States Magistrate Judge for further proceedings. ECF No. 5. Ratliff has not consented to proceed before the undersigned magistrate judge. ECF No. 8. In accordance with the order of transfer, the undersigned enters this Report and recommends that this action be dismissed under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

## I.    Background

Ratliff was tried and civilly adjudged to be a sexually violent predator (SVP), as defined by Texas Health & Safety Code § 841.003. Upon his release from the Texas Department of Criminal Justice (TDCJ) after completing his criminal sentence, the State of Texas transferred Ratliff to the Bill Clayton Detention Center in Littlefield, Texas,[1] where he remains confined for inpatient treatment in accordance with the provisions of Texas Health & Safety Code § 841.081.

---

[1] The Bill Clayton Detention Center is also known as the Texas Civil Commitment Center (TCCC). TCCC is operated by Correct Care Recovery Solutions, a private company under contract with the Texas Civil Commitment Office (TCCO). *See Texas Civil Commitment Center*, Correct Care Recovery Sols., http://www.correctcarers.com/tccc (last visited Oct. 25, 2018).

Ratliff is confined pursuant to an order of civil commitment; therefore, he is not considered a "prisoner" within the meaning of 28 U.S.C. § 1915(h) and is not subject to the screening procedures of 28 U.S.C. § 1915A. *See Bohannan v. Doe*, 527 F. App'x 283, 289–90 (5th Cir. 2013) (concluding that a civilly committed SVP was not a prisoner within the meaning of the Prison Litigation Reform Act); *Michau v. Charleston Cty.*, 434 F.3d 725, 727 (4th Cir. 2006) (same); *Allen v. Seiler*, No. 4:12–CV–414–Y, 2013 WL 357614, at *1 n.1 (N.D. Tex. Jan. 30, 2013), *aff'd*, 535 F. App'x 423, 423 (5th Cir. July 12, 2013) (per curiam) (citing *Jackson v. Johnson*, 475 F.3d 261, 266 (5th Cir. 2007)) (same). Because Ratliff is proceeding IFP, however, he is nevertheless subject to the screening provisions of 28 U.S.C. § 1915(e)(2)(B). Accordingly, the court reviewed Ratliff's Complaint and entered an order directing Ratliff to complete a questionnaire in accordance with *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976) to further develop his allegations. Ratliff timely completed and returned the questionnaire. ECF Nos. 12, 13.

## II.    Standard of Review

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.    28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002) (affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327. When

analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical or other prison records if they are adequately identified and authenticated").

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim*, 836 F.3d at 469.    And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

### III.    Discussion

In his Complaint, Ratliff identifies the following Defendants:    (1) Marsha McLane, Executive Director of TCCO; (2) Genna Marx Brisson, senior vice president of operations;[2] (3) Brian Thomas, TCCC facility manager; (4) Manny Fernandez, vice president of operations at Correct Care Recovery Solutions (CCRS); (5) Mrs. Leaks, property officer at TCCC; (6) TCCC; (7) CCRS; and (8) City of Littlefield, Texas. Compl., at 1–3, 8 (ECF No. 1).[3]    In his questionnaire responses, Ratliff also names the following individuals as Defendants:    (1) Dr. Jack Pieniazek; (2) D. Chamberlain Webb, R.N.; (3) Clinical Director Towns, TCCO mental health; (4) C. Woods,

---

[2] Ratliff does not specify which entity employs Brisson. *See* Questionnaire, at 33 (ECF No. 13).
[3] Page citations to Ratliff's pleadings cite to the electronic page number assigned by the court's electronic filing system.

chief of security at TCCC; and (5) K. Harmon, therapist. Questionnaire, at 1, 43. Ratliff generally alleges that Defendants have denied him adequate mental health care and sufficient medical treatment for his HIV infection. Compl., at 2–9; Questionnaire, at 1–45. Ratliff further asserts that Brian Thomas, C. Woods, and Marsha McLane housed him in a fourteen-person dormitory, which was detrimental to his health. Compl., at 5; Questionnaire, at 43. Ratliff also contends that Mrs. Leaks intentionally deprived him of his personal property and verbally insulted him. Compl., at 8. Finally, Ratliff claims that the City of Littlefield violated his constitutional rights by allowing TCCO to open and operate TCCC in Littlefield. *Id.* at 1; Questionnaire, at 37, 43. Ratliff seeks monetary damages as a result of these alleged constitutional violations. Compl., at 12.

**A.    Ratliff has not alleged facts demonstrating Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.**

Ratliff, who is HIV positive, asserts a variety of allegations; however, the crux of his claim is that Defendants have not provided him with adequate mental health treatment or care for his HIV infection. Although not cogently stated, Ratliff makes the following specific contentions with respect to his Eight Amendment claim: (1) Dr. Pieniazek and Nurse Webb should have administered a CD-4 blood test; (2) the medical department (i.e., unnamed employees of CCRS) did not timely update him regarding the results of blood tests; (3) Dr. Pieniazek and Nurse Webb should have prescribed him certain medications for HIV treatment; (4) C. Woods, Brian Thomas, and K. Harmon acted contrary to best medical practices by placing him in solitary confinement; and (5) Dr. Pieniazek, Nurse Webb, and Clinical Director Towns should have permitted him to receive treatment at a free-world clinic in Lubbock, Texas, called Project CHAMPS. *See* Compl., at 2–12; Questionnaire, at 1–69.

4

As a civilly committed person, Ratliff's right to reasonably adequate medical care is derived from the Eighth Amendment. *See, e.g.*, *Bohannan*, 527 F. App'x at 291–92 (applying the Eighth Amendment deliberate indifference standard to an SVP's claim of inadequate medical care). Ratliff has not alleged an Eighth Amendment violation, however, on the facts before the court.

Under the Eighth Amendment, prison officials[4] have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (emphasis in original)). Deliberate indifference "is an 'extremely high' standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009)), and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell,* 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.*; *see also Harris*

---

[4] The court recognizes that civilly committed persons are not prisoners, and their rights may differ from those of prisoners. *See Bohannan*, 527 F. App'x at 289–90. Nevertheless, this Circuit has addressed deliberate indifference to medical care claims by civilly committed individuals within the same substantive framework as similar suits brought by prisoners. *See id.* at 291–92. This court thus evaluates Ratliff's claim within the same substantive standard as would apply in a similar case brought by a prisoner.

*v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

A prison official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)) (alterations and internal quotation marks omitted). "[D]eliberate indifference cannot be inferred merely from negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

6

1.    **The majority of Ratliff's claims amount to his disagreement with the medical treatment Defendants have provided.**

The facts Ratliff alleges do not demonstrate that Defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly," or otherwise engaged in conduct evincing a wanton disregard for Ratliff's serious medical needs. *Gobert*, 463 F.3d at 346. Instead, Ratliff makes conclusory allegations, supported primarily by sick call forms and grievances attached to his questionnaire responses, which only marginally relate to the claims he makes. *See* Questionnaire, at 1–70. Rather than alleging that Defendants refused *all* care or treatment, Ratliff instead expresses dissatisfaction with the type of care and medication Defendants did provide. Disagreement with medical treatment, however, does not constitute deliberate indifference. *See Domino*, 239 F.3d at 756; *see also Sims v. Dretke*, 212 F. App'x 276, 277 (5th Cir. 2006) (explaining that prisoner's claim that defendants denied him HIV medication in violation of his constitutional rights amounted to a disagreement with treatment, where prisoner admitted officials medically examined him "on numerous occasions").

For example, while Ratliff may have preferred that Dr. Pieniazek or Nurse Webb administer a CD-4 blood test or prescribe him different medication, such decisions rest within their sound medical judgment. *See, e.g., Scott v. Wackenhut Corp.*, No. 01-30178, 2001 WL 803863, at *1 (5th Cir. June 14, 2011) (affirming dismissal of prisoner's claim where his allegation that defendants did not conduct frequent blood testing constituted a disagreement with officials regarding medical treatment); *Domino*, 239 F.3d at 756 (stating that the decision of whether to provide additional, or specialized, medical treatment is an example of pure medical judgment; the exercise of such judgment does not constitute deliberate indifference); *Smith v. Larpenter*, Civil Action No. 16-15778, 2017 WL 2773662, at *7 (E.D. La. May 3, 2017) (citing *Brauner v. Coody*,

7

793 F.3d 493, 498–99 (5th Cir. 2015)) ("In any event, the decision of which specific medication to prescribe [a prisoner] is a classic example of a matter of medical judgment which is not actionable under § 1983."); *Tassin v. Pacheco*, No. 08-CV-1079, 2009 WL 959985, at *3 (W.D. La. Apr. 8, 2009) (recommending dismissal of prisoner's claims that defendants failed to prescribe him the proper HIV medication and were liable for refusing to consult with an HIV specialist because such claims amounted to a disagreement with treatment); *see also Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (noting that prisoner's allegation amounted to disagreement with treatment where prisoner solely alleged prison doctor did not prescribe the medication prisoner desired). At best, Ratliff's allegations *might* amount to a state law claim for negligence or malpractice, but would again fall short of stating a viable constitutional claim under § 1983. *See Gobert*, 463 F.3d at 346.

Similarly, Ratliff's claim that Defendants prevented him from attending an appointment at a free-world clinic—Project CHAMPS[5]—does not rise to the level of a constitutional violation. As discussed in detail in Section II.A.3 below, the authenticated records show, and Ratliff concedes, that Defendants have examined and treated him numerous times. Although Ratliff may desire different treatment or examination by different medical professionals, the fact that Defendants allegedly did not transport him for such an appointment, standing alone, does not violate the Constitution.[6] *See, e.g., Nelson v. Morris*, No. 4:16CV127-DMB-JMV, 2017 WL 2954649, at *3 (N.D. Miss. Jan. 9, 2017) (recommending dismissal of prisoner's deliberate

---

[5] Project CHAMPS provides health care and support for individuals with HIV infections. *Project CHAMPS*, S. Plains Cmty. Action P'ship, https://spcaa.org/champs-program (last visited Oct. 25, 2018).

[6] Although Ratliff generally asserts in his Complaint that Defendants "denied access to health care staff qualified to address the plaintiff's health problems" and cancelled medical appointments (Compl., at 5, 7, 10), his claim exclusively centers around his belief that Defendants should have transported him to Lubbock for an appointment at Project CHAMPS. *See* Compl., at 5; Questionnaire, at 2. In other words, he does not allege that Defendants cancelled medical appointments at TCCC or otherwise completely denied him access to health care. *See* Questionnaire, at 2.

indifference claim where he alleged defendants should have referred him to a "free world specialist"); *see also Alfred v. Tex. Dep't Criminal Justice*, 80 F. App'x 926, 927–28 (5th Cir. 2003) (finding refusal to allow inmate to see a specialist did not amount to deliberate indifference to a serious medical need).

> **2.    Ratliff has not pleaded facts demonstrating that Defendants failed to timely deliver his prescribed medications, were subjectively aware of any alleged interruption in medications, or that such interruption caused him serious harm.**

With respect to Ratliff's claim that TCCC often "[ran] out of medications and refills" (Questionnaire, at 11), he also has not pleaded facts showing Defendants acted with deliberate indifference.  Initially, the court notes that Ratliff attributes the alleged failure to restock the prescribed medication to Dr. Pieniazek and Nurse Webb. *Id.* at 11, ¶ 4.a.  But he alleges no facts showing that these particular Defendants had any control over ordering and refilling medication— e.g., that they served in the role of a pharmacist.  For this reason alone, Ratliff cannot state a constitutional violation. *See, e.g., Evans v. Bonner*, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (noting that prisoner failed to establish defendants "acted with a sufficiently culpable state of mind" and could not, therefore, state a claim that defendants acted with deliberate indifference by allegedly failing to timely provide prisoner's HIV medications).

More importantly, Ratliff has not pleaded facts establishing that Defendants' actions actually interrupted his prescribed medication, or that any interruption caused him serious harm. Problematically, Ratliff provides few facts regarding his claim, other than the conclusory statement that Defendants interfered with his medical treatment through "[t]he constant running out of medications and refills."  Questionnaire, at 11.  Based on the scant facts Ratliff did provide, however, it appears there are two incidents of which he complains: (1) August 13, 2017; and (2)

May 20, 2018.[7]  With respect to the August 2017 incident, Ratliff refers to a "nursing progress note" dated August 13, 2017, which indicates that CCRS did not have one of his prescribed medications, Keppra,[8] in stock.  *See* Questionnaire, at 12.  The authenticated records show that between August 10 and August 15, CCRS medical personnel did not administer Keppra to Ratliff. On August 13, 2017, the records show Ratliff completed a "Healthcare Request," explaining that he needed a refill of the Keppra because he had not been able to take it for three days.  In response, a medical team member informed Ratliff that she had placed a refill request and the medication would be delivered to TCCC as soon as the pharmacy filled the request.  Thus, even assuming Ratliff was unable to take his medication for approximately six days (which the court deduced from the records, not Ratliff's Complaint or questionnaire responses), he has not pleaded, and the records do not show, that CCRS medical personnel ignored, intentionally disregarded, or otherwise acted with deliberate indifference to his refill request.  To the contrary, officials placed a refill request within one day of receiving Ratliff's notification that he did not have any more Keppra, and informed Ratliff of same.

Similarly, Ratliff's pleadings do not show that CCRS personnel acted with deliberate indifference to his serious medical needs in May 2018.  A grievance attached to his questionnaire responses, dated May 20, 2018, shows that despite Ratliff's allegation that Defendants "ran out" of his medications, they nonetheless provided him with all of his HIV medications.  In response to

---

[7] Despite direct inquiry by the court, Ratliff did not provide specific dates on which he alleges Defendants failed to furnish him with his prescribed medications.  *See* Compl., at 3; Questionnaire, at 11 (asserting that Defendants did not take him to a Project CHAMPS appointment on May 1, 2017).  The grievance dated May 20 and the typed paragraph related to the alleged August 2017 incident (which appears to be copied from a medical record) are the only items Ratliff supplied related to such claims.  The court therefore considers only these instances in relation to Ratliff's claims that he did not receive prescribed medication.

[8] Keppra is a medication doctors prescribe to treat seizure disorders.  *Keppra*, Physicians' Desk Reference S-471 (71st ed. 2017).

Ratliff's May 20 grievance, Valarie Velasquez, R.N., informed Ratliff that his prescribed "Dolutegravir was delivered on 05-22-18 and still have pills left in current blister pack. Other HIV medications are also filled. They are all in med cart in Bravo dorm." Questionnaire, at 19. Although the authenticated records show that there might have been a brief, two-day interruption (on May 21 and 22) in one of Ratliff's anti-viral medications (lamivudine), the records show that medical personnel placed an order for the medication and Ratliff resumed taking it on May 23, 2018. Thus, by Ratliff's own admission (as incorporated through the grievances he attached to his questionnaire responses), and as confirmed by the authenticated records, he received his HIV medication as prescribed in May 2018, save for a short, two-day interruption of one medication.

In addition, Ratliff has not claimed that he suffered any serious adverse medical effects as a result of either of the alleged short interruptions in his seizure and anti-viral medications.[9] An alleged delay, standing alone, does not rise to the level of deliberate indifference. *See, e.g.*, *Bohannan*, 527 F. App'x at 292 ("While Bohannan alleges that the unnamed defendants did not immediately provide him with medication prescribed by other physicians prior to his incarceration, he has not shown that they deprived him of medical attention with wanton disregard for his needs."); *Marshall v. Patel*, 317 F. App'x 395, 396–97 (5th Cir. 2009) (stating that prisoner's allegation that defendant acted with deliberate indifference when defendant's "order to increase the dosage of [prisoner's] pain medication was inexplicably delayed for several months" did not amount to an Eighth Amendment violation); *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) (affirming jury's finding that an alleged seven-day and five-day interruption in HIV

---

[9] Indeed, Ratliff does not claim he suffered any effects. *See* Questionnaire, at 11–12 (asserting that "HIV meds must be consistent as scheduled," claiming "[m]edications changed, and not received in a timely manner," and noting that the delay caused him harm because TCCC officials placed him in the "SMU (Special Management Unit)").

medications did not constitute an Eighth Amendment violation where prisoner "presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need"); *Evans*, 196 F. Supp. 2d at 256 (holding that defendant's untimely provision of HIV medication, and the alleged resulting "aches, pains and joint problems" prisoner suffered, "[did] not rise to a 'sufficiently serious' level" such that prisoner stated a claim for deliberate indifference).

For these reasons, Ratliff's claim that Defendants violated the Constitution by failing to provide his medications as prescribed should be dismissed.

### 3.    Ratliff concedes, and the authenticated records show, that Defendants provided medical treatment.

Finally, contrary to Ratliff's contention, the pleadings and record before the court demonstrate that Defendants at TCCC have consistently provided Ratliff with medical treatment. During the period in question (April 26, 2017, through August 2018), Ratliff acknowledges, and the authenticated records show, over forty interactions or entries related to examinations, testing, prescriptions, and/or treatment. The records also contain countless entries related to individual and group therapy counseling sessions. Ratliff concedes, through the attachments to his questionnaire responses, that Defendants prescribed him anti-viral medication, ordered and performed lab work, and examined him on multiple occasions. *See* Questionnaire, at 3, 13 (acknowledging that Dr. Pieniazek ordered blood work and prescribed medication in May 2017 and April 2018); 9, 20 (showing that CCRS personnel scheduled Ratliff for daily blood pressure checks in April 2018); 53–61, 65–69 (reflecting lab work results from May and August 2017);

4, 6–8, 13, 18, 27–29 (In response to Ratliff's grievances, TCCC staff acknowledged that Ratliff was examined by medical department in August 2017 as well as April and June 2018.).

Likewise, the authenticated records show that CCRS medical personnel examined Ratliff routinely and responded to his sick call requests. For example, Dr. Pieniazek conducted a "telemed visit" with Ratliff on May 6, 2017, during which time Ratliff declined to take the anti-viral medication Viread because it had caused him to suffer side effects in the past. In response, Dr. Pieniazek noted that he would check Ratliff's sensitivity to Abacavir—a different anti-viral regimen—and would prescribe that if suitable for Ratliff. Dr. Pieniazek also noted that although Ratliff had contracted HIV more than twenty years prior, Ratliff could not "recall what meds worked best for him." On June 20, Dr. Pieniazek conducted another telemed visit with Ratliff, at which time Dr. Pieniazek discussed an alternative anti-viral treatment regimen with Ratliff; the records show that Dr. Pieniazek ultimately prescribed Ratliff Abacavir. On August 18, a nurse examined Ratliff after he submitted a sick call regarding his HIV medication. Ratliff complained that the medication made him hungrier. The nurse noted that medical staff drew Ratliff's blood one day prior. The records further show that Ratliff attended individual and group therapy sessions as well as multiple psychiatry appointments with Dr. Shiraj A. Vahora between May 2017 and April 2018, including one appointment while Ratliff was housed in SMU.[10] The records reflect that Dr. Vahora also prescribed Ratliff anti-depressant and anti-anxiety medication and adjusted the dosing as medically necessary. Thus, Ratliff's admissions, combined with the authenticated

---

[10] Although unclear, it appears Ratliff attempts to claim that C. Woods, Brian Thomas, and K. Harmon should not have placed him in SMU—i.e., solitary confinement—because he is a "mental patient that warrants the proper mental health experts to examin [sic] issues before being lock [sic] away in a solitary confinement. Plaintiff also has a terminally ill deficiency." Questionnaire, at 44–45. This fact, Ratliff contends, demonstrates that Defendants provided inadequate mental health treatment. *See id.* at 43 (In response to the court's prompt to "[l]ist the date(s) on which you believe you received inadequate mental health care," Ratliff stated, "Being placed in solitary confinement."). As such, the court interprets Ratliff's claim solely as one for deliberate indifference to serious medical needs—not as one based on inadequate due process.

records, demonstrate that Defendants were responsive to his complaints and did not refuse to treat or otherwise ignore his serious medical needs, including management of his HIV infection and mental health conditions. *See Ramirez v. Stacks*, 260 F. App'x 658, 259 (5th Cir. 2007) (holding magistrate judge could rely on authenticated medical records to determine whether plaintiff received constitutionally adequate care without making impermissible credibility determinations).

In sum, based on the facts Ratliff alleges, he has failed to demonstrate that Defendants acted with deliberate indifference to his serious medical needs. Moreover, the authenticated records confirm, contrary to Ratliff's conclusory allegations, that Defendants were responsive to Ratliff's medical requests and prescribed, administered, and adjusted medication as needed. Accordingly, the district court should dismiss his claims based on deliberate indifference.

**C.    Ratliff has not pleaded facts demonstrating Defendants subjected him to unconstitutional conditions of confinement.**

Ratliff asserts that Brian Thomas, C. Woods, and Marsha McLane housed him in a fourteen-person dorm, placing him "at the risk of developing certain diseases . . . [by] [c]onfinement in filthy dorm or living quarters where exposed to mentally ill patients not physical injury." Compl., at 5.

At the outset, Ratliff does not specify how living in a fourteen-person dormitory, by itself, violated his constitutional rights, or how living in such conditions harmed him. *See Smith v. Hood*, 900 F.3d 180, 186 (5th Cir. 2018) (holding involuntarily committed plaintiff had not stated a claim based on his allegation that "placing him in the forensic unit at the State Hospital" violated his rights because plaintiff "fail[ed] to assert any coherent legal theory, either in his briefs or in his complaint below, explaining how these actions violated his federal rights"). For this reason alone, Ratliff's claim should be dismissed.

Even liberally construing his claim as one based on unconstitutional conditions of confinement, however, Ratliff has not pleaded sufficient facts to state a claim. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Officials "enjoy wide latitude," however, "in developing treatment regimens [for SVPs]." *Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997). Where an official's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," the official may be liable for a constitutional deprivation. *Youngberg*, 457 U.S. at 323.[11]

In this case, Ratliff has not asserted any facts showing how his living conditions constituted "a substantial departure from accepted professional judgment." *See id.* Moreover, Ratliff only alleges that such conditions hypothetically "placed him at the risk of developing certain diseases"—not that he actually suffered any harm. Compl., at 5; *see also* Questionnaire, at 43 (stating that TCCC officials should provide adequate mental health treatment but not claiming that

---

[11] The Fifth Circuit has not considered which legal standard applies to an SVP's challenge to the conditions of his confinement, i.e., the Eighth Amendment or the *Youngberg* standard. Other courts, however, have applied the *Youngberg* standard. *See, e.g., West v. Schwebke*, 333 F.3d 745, (7th Cir. 2003) (applying the *Youngberg* standard to civil detainee's claim that defendants held him in "therapeutic seclusion" in violation of his constitutional rights); *Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300, at *13 (N.D. Ill. Jan. 14, 2005) (reviewing involuntarily committed person's § 1983 conditions of confinement claim under *Youngberg*); *see also Turay v. Seiling*, 108 F. Supp. 2d 1148, 1151 (W.D. Wa. 2000) (applying the *Youngberg* standard to SVP's claim that defendants did not provide adequate mental health treatment). Moreover, in *Perniciaro v. Lea*, an involuntarily detained (but not yet committed) plaintiff alleged that, among other claims, defendants "failed to maintain reasonably safe conditions of confinement." 901 F.3d 241, 250 (5th Cir. 2018). Plaintiff argued that *Youngberg*'s professional judgment standard applied, while defendants argued for application of the Eighth Amendment's deliberate indifference standard, which generally applies to pre-trial detainees. The Fifth Circuit held, without deciding the applicable standard, that even assuming the *Youngberg* standard applied, plaintiff had failed to establish defendants' conduct was unreasonable. *Id.* at 255. In so deciding, the Fifth Circuit noted that the *Youngberg* standard is "a less deferential, higher standard for state officials than is deliberate indifference." *Id.* at 256 n.14. As in *Perniciaro*, this court finds that even if the *Youngberg* standard applies, Ratliff has not satisfied its lower bar.

Defendants failed to provide him adequate care while living in the fourteen-person dormitory). Accordingly, the district court should dismiss Ratliff's claim based on the conditions of his confinement.

**D.      Ratliff has not pleaded adequate facts to raise a viable constitutional claim concerning Mrs. Leaks's alleged deprivation of his personal property or her purported verbal harassment.**

Ratliff makes a conclusory allegation that "property officer Mrs. Leaks treated Plaintiff as a leper." Compl., at 8. He claims that Mrs. Leaks delayed providing him with, or deprived him of, his personal property, and made "unprofessional" comments to him. *Id.* at 8–9.

An official's actions—whether negligent or intentional—that result in a loss of property constitute a state tort action rather than a federal civil rights claim. Indeed, a state actor's negligence that results in an unintentional loss of property does not violate the Constitution. *See Simmons v. Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988). Similarly, an intentional deprivation of personal property does not give rise to a viable constitutional claim as long as the plaintiff has access to an adequate state post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (citing several cases for support) ("An inmate's allegation that his personal property was lost, confiscated, or damaged does not state a claim under 42 U.S.C. § 1983, even when prison officials acted intentionally."). The State of Texas provides an adequate post-deprivation remedy for persons asserting claims such as those raised herein by Ratliff—the filing of a lawsuit for conversion in state court. *See, e.g., Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994). If Mrs. Leaks did in fact wrongfully take or lose Ratliff's property as alleged, Ratliff may have a cause of action in state court; however, he cannot pursue a constitutional claim in federal court. *Stauffer*, 741 F.3d at 583; *see Thompson v. Steele*, 709 F.2d 381, 383 (5th Cir. 1983).

Likewise, Ratliff cannot state a claim based on Mrs. Leaks alleged verbal remarks. The Fifth Circuit has long recognized that verbal threats or harassment made by a correctional officer do not provide a legitimate basis for a § 1983 claim. *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143 (5th Cir. 1983)); *see Rader v. Lubbock Cty.*, No. Civ. A. 5:01-CV-258-C, 2003 WL 21145788, at *13 (N.D. Tex. Apr. 25, 2003) (quoting *Robertson*, 70 F.3d at 24) (dismissing prisoner's claim that defendant verbally taunted and threatened him because "mere threatening language and gestures of a custodial office[r] do not, even if true, amount to constitutional violations"). Verbal threats, abusive language, or other harassment, "while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." *Johns v. Miller*, No. 05-2489, 2005 WL 3592248, at *7 (E.D. La. Oct. 26, 2005) (citing *Slagel v. Shell Oil Reference*, 23 F.3d 410 (7th Cir. 1994)); *see also Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (holding that a sheriff's threat to hang a prisoner did not constitute an actionable claim under § 1983). Ratliff's claims against Mrs. Leaks should therefore be dismissed.

**E.    Ratliff's claims against Director McLane, Genna Marx Brisson, Brian Thomas, and Manny Fernandez must be dismissed because the law does not impose vicarious liability under § 1983 for the actions of subordinates.**

Ratliff generally attributes his alleged constitutional harms—denial of adequate medical care, unconstitutional conditions of confinement, etc.—to Director McLane, Genna Marx Brisson, Brian Thomas, and Manny Fernandez. Compl., at 1–2; Questionnaire, at 11, 33, 35, 37. Ratliff does not specify any particular actions taken by such Defendants, however, demonstrating their personal involvement in the alleged constitutional violations. To the extent Ratliff alleges Director McLane, Brisson, Thomas, and Fernandez are responsible for the actions of their subordinates, such claims must also be dismissed.

17

Courts have repeatedly rejected attempts to impose liability on supervisors or those in authority for alleged constitutional violations committed by their subordinates. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (citing *Lopez v. Hous. Indep. Sch. Dist.*, 817 F.2d 351, 455 (5th Cir. 1987)); *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992); *Thibodeaux v. Arceneaux*, 768 F.2d 737, 739 (5th Cir. 1985) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–95 (1978)). Instead, a supervisory official is only liable when: (1) she affirmatively participated in an act that caused a constitutional deprivation, or (2) she implemented an unconstitutional policy that resulted in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)); *see also Murphy*, 950 F.2d at 292 n.7 (citations omitted) (noting that a plaintiff must specify the personal involvement of each defendant in a § 1983 action, demonstrating "an affirmative link between the incident and some act by the defendant").

At the outset, the court notes it has already determined that Ratliff has not stated a cognizable constitutional claim. Without a non-frivolous allegation that his constitutional rights were violated, Ratliff cannot state a claim for supervisory liability. *See Mouille*, 977 F.2d at 929.

Even assuming he has pleaded a viable constitutional violation, however, Ratliff has not alleged any facts demonstrating that Director McLane, Genna Marx Brisson, Brian Thomas, and Manny Fernandez were personally involved in an action that allegedly caused such a violation, nor has Ratliff alleged they implemented an unconstitutional policy that resulted in his injury. Ratliff claims that he personally spoke with Director McLane and Brian Thomas regarding his health care and confinement in the SMU. Questionnaire, at 14, 33. Even taking such facts as true, Ratliff's allegations do not establish deliberate indifference by Director McLane and Thomas to a serious medical need. *See* Questionnaire, at 14 (Ratliff attached a copy of a letter he allegedly

18

drafted to Director McLane, which states: "You told me that if TCCO didn't have to pay for [the appointment at Project CHAMPS] I could go."); 33 (In response to court's prompt asking Ratliff to describe how Thomas violated his constitutional rights, Ratliff alleged: "I not only sent Mr. Thomas communication forms while in SMU, I spoke with Mr. Thomas *briefly* while in SMU." (emphasis added)).  Such general communication, even if it occurred, does not demonstrate the transfer of facts to these officials such that they could draw an inference of a substantial risk of serious harm, *and* that they drew such an inference.  Moreover, with respect to his claims against Brisson and Fernandez, he pleads no facts showing any interaction or personal involvement.  *See* Compl., at 2 (naming Fernandez as a Defendant because he is the "V.P. of Operations" at CCRS); Questionnaire, at 13 (leaving blank the questions asking Ratliff to explain how Fernandez violated his constitutional rights); 33 (claiming that "Brisson was aware of constitutional violations when actively visited [TCCC]"). Without asserting any facts indicating Director McLane, Genna Marx Brisson, Brian Thomas, or Manny Fernandez were personally involved in a constitutional violation, or that they implemented an allegedly unconstitutional policy,[12] Ratliff cannot establish a claim based on supervisory liability. *See Hitt v. McLane*, A–17–CV–289–SS, 2018 WL 773992, at *8–9 (W.D. Tex. Feb. 7, 2018) (holding SVP had failed to establish claim for supervisory liability where SVP did not identify a policy or custom that violated his constitutional rights, nor did the SVP allege an underlying constitutional violation).  Accordingly, his claims against Director McLane, Genna Marx Brisson, Brian Thomas, and Manny Fernandez should be dismissed as frivolous on this basis as well.

---

[12] Ratliff contends that "Marsha McLane, TCCC and CCRS conjoined [sic] in a coordinated effort to implement a government policy to deny the proper medical care to the Plaintiffs . . . ." Compl., at 3.  He did not provide any facts, however, to support his conclusory claim that McLane instituted an allegedly unconstitutional policy.  *See* Questionnaire, at 11.

**F.    TCCC and TCCO are not proper entities that may be sued under § 1983.**

Section 1983 provides for liability against any *person* who, acting under color of law, deprives an individual of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983 (2017).  Neither states nor state agencies are "persons" against whom a § 1983 claim for money damages can be asserted.  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)); *see Will*, 491 U.S. at 66 ("Our conclusion that a State is not a 'person' within the meaning of § 1983 is reinforced by Congress' purpose in enacting the statute.").  As such, Ratliff's claims against TCCC and TCCO—agencies of the state of Texas—should be dismissed as frivolous.

**G.    Ratliff has not alleged facts showing that CCRS implemented an official policy or custom that violated his constitutional rights.**

Although not entirely clear, Ratliff seems to name CCRS as a Defendant.  *See* Compl., at 2.  CCRS is a private corporation.  *See supra* note 1.  Despite its status as a private entity, however, CCRS qualifies as a state actor under § 1983.  *See Hitt*, 2018 WL 773992, at *8; *Stone v. Gusman*, Civ. A. No. 16-1321, 2017 WL 3037632, at * 2 (E.D. La. June 21, 2017) (noting CCRS qualifies as a state actor although it is a private entity); *see also Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) ("[P]rivate corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983.").  Nevertheless, Ratliff's claims against CCRS should be dismissed, as he attempts to hold CCRS vicariously liable for alleged unconstitutional actions committed by its employees.  As previously discussed, a § 1983 lawsuit cannot be based upon vicarious liability.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or respondeat

superior liability."); *Thompkins*, 828 F.2d at 303 ("Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."); *see also Stone*, 2017 WL 3037632, at *2 ("It is beyond cavil that a § 1983 claim cannot be based on the theory of *respondeat superior*."); *Easter v. Lafourche Par. Sheriff's Office*, Civ. A. No. 13-5797, 2014 WL 3687239, at *3 (E.D. La. July 23, 2014) ("[P]laintiff appears to be attempting to hold [the private corporation providing the jail's medical services] liable based on a theory of vicarious liability, which simply is not allowed in an action filed pursuant to 42 U.S.C. § 1983.").  Because Ratliff merely claims CCRS is vicariously liable for an alleged constitutional violation, and fails to allege any other basis on which CCRS itself could be held liable for violating his rights, Ratliff has failed to state a claim against CCRS.  *See Stone*, 2017 WL 3037632, at *3 (holding plaintiff failed to state a claim against CCRS because he merely alleged the company was vicariously liable for the actions of its employees and did not contend CCRS adopted an unconstitutional policy that harmed him).  The district court should therefore dismiss Ratliff's claim against CCRS.

## H.    Ratliff has not pleaded sufficient facts to support a claim for municipal liability against the City of Littlefield.

Ratliff alleges that the "City of Littlefield knowingly profited by imprisonment of the mentally ill.  Allowing [TCCO] to imprison persons to gain employment to citizens for the soul [sic] purpose of profit, not treatment and not investing in medical or therapeutic treatment." Questionnaire, at 43.  Ratliff also alludes to issues with his ballot and/or voter registration on an unspecified date. *Id.* at 37.

While again unclear, it appears Ratiliff alleges the City of Littlefield violated the Constitution by allowing TCCO to operate the commitment facility within its city limits for the purpose of profit to its citizens and the community, rather than providing appropriate medical

21

treatment, counseling, and support. To the extent Ratliff is attempting to challenge the sheer constitutionality of civil commitment, he fails to state a viable claim for relief. *See, e.g., Kansas v. Hendricks*, 521 U.S. 346, 350, 360 (1997) (recognizing the constitutionality of a Kansas state law similar to Texas statute, which establishes procedures for civilly committing SVPs); *In re Fisher*, 164 S.W.3d 637, 656 (Tex. 2005) (upholding Texas's procedures for the civil commitment of SVPs). In addition, for the reasons previously discussed above, any claim challenging the treatment provided to Ratliff by the medical professionals employed at the facility also fails to meet constitutional muster. As a result, the court should dismiss any such claims against the City of Littlefield on this basis.

To the extent Ratliff attempts to assert a claim against the City based on municipal liability for alleged voting issues, he has likewise failed to state a claim. To establish municipal liability under § 1983, a plaintiff must demonstrate the following elements: (1) a policymaker; (2) an official policy; and (3) a policy or custom "whose 'moving force'" causes a violation of constitutional rights. *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694). The plaintiff must identify a policy that, when executed, caused him to suffer a constitutional injury. *Monell*, 436 U.S. at 694. A municipality cannot "be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578. The Fifth Circuit has explained that the three elements "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier*, 142 F.3d

791, 796 (5th Cir. 1998) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997)).

Ratliff has not alleged any facts demonstrating the three elements necessary to establish municipal liability against the City of Littlefield. First, Ratliff does not identify a "policymaker"— i.e., someone who has the authority under state law to create and implement a policy on behalf of the city or county at issue. *Bennett v. City of Slidell*, 728 F.2d 762, 768–69 (5th Cir. 1984); *see Yetiv v. Hall*, 132 F. App'x 1, 2 (5th Cir. 2005) (explaining that plaintiff did not state a claim for municipal liability where he alleged city agents were harassing him, "but [did] not allege that those agents were policymakers or were directed by a policymaker"); *Gaynier v. Hudson*, Civil Action No. 3:16-CV-2314-D-BK, 2017 WL 2348809, at *5 (N.D. Tex. Mar. 22, 2017) (recommending dismissal of plaintiff's complaint in part because she did not identify an official policymaker).

Second, Ratliff has pleaded no facts demonstrating an "official policy"—a policy statement, ordinance, regulation, or a "persistent, widespread practice" of officials and employees that "is so common and well-settled as to constitute a custom that fairly represents municipal policy . . . ." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984)). Although he generally implies the City's actions caused issues with his ability to vote, Ratliff has not specifically alleged the City acted pursuant to an official policy. Questionnaire, at 42–43. Indeed, when asked to specify how the City's policy violated his constitutional rights, Ratliff merely claims that "[t]he City of Littlefield knowingly profited by imprisonment of the mentally ill"; he makes no mention of voting. Questionnaire, at 43. He also never asserts that the City acted pursuant to an official policy or widespread custom. Thus, Ratliff has pleaded no facts demonstrating the existence of an unconstitutional policy. *See Piotrowski*, 237 F.3d at 581–82 (explaining that plaintiff failed to show existence of a city policy for failure to

investigate and discipline officers, where plaintiff did not establish a "pattern of complaints by other citizens").

Finally, Ratliff has also failed to show that any alleged policy is "the moving force behind, and the direct cause of, the violation of [his] constitutional rights . . . ." *Williams*, 352 F.3d at 1014 (citing *Brown*, 520 U.S. at 404–05). Initially, the court notes that merely "rejecting" a ballot, as Ratliff claims, does not, by itself, qualify as constitutional harm. *See generally Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 310 (5th Cir. 2004) (internal quotations omitted) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1990)) (explaining that "the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers 'with deliberate indifference as to its known or obvious consequences"). Moreover, Ratliff has not demonstrated a "direct causal link" between any policy and the alleged voting problems. *Piotrowski*, 237 F.3d at 580. At best, Ratliff merely asserts a personal belief that the City's alleged actions represent an official policy that has caused him harm.

For these reasons, the district court should dismiss Ratliff's claim against the City of Littlefield.

## IV.    <u>Recommendation</u>

For the foregoing reasons, the undersigned recommends that the United States District Court dismiss Ratliff's Complaint and all claims therein with prejudice in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

## V.   <u>Right to Object</u>

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2017); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: November 9, 2018

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE